# Kentucky Utilities Co. v. Hammons.

## Nov. 15, 1940.

### J. S. Forrester, Judge.

T. M. Galphin, Jr., Gordon, Laurent, Ogden & Galphin and Logan E. Patterson for appellant.

Golden & Lay for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

On February 8, 1938, this court reversed the judgment of the Bell Circuit Court affirming an award by the Workmen's Compensation Board to the appellee, Tipton Hammons, for permanent total disability occasioned by the inhalation of carbon monoxide while in appellant's employ. In the original opinion we stated that there was no competent evidence to sustain the Board's finding that the appellee, Hammons, had been totally and permanently disabled, but that there was some competent substantial evidence to sustain the Board's finding that he had suffered some injury by the inhalation of the gas at appellant's plant. However, that opinion was modified on rehearing, and in the final opinion delivered on May 10, 1938, and reported in 273 Ky. 375, 116 S. W. (2d) 298, 300, the word ''substantial'' was omitted from

the sentence referred to. In the concluding paragraph we directed the Circuit Court to remand the case to the board "for further hearing and determination, [and] upon competent evidence, whether appellee sustained injury by breathing carbon monoxide and, if so, to what extent he was disabled thereby".

Upon the return of the case to the Board in August, 1938, the appellant filed a motion with the Board to fix the time within which the parties might introduce additional proof and in support of the motion filed an affidavit of one of its attorneys to the effect that appellant had discovered that the appellee, Hammons, in September, 1936, had secured employment in Detroit in the DeSoto Factory of the Chrysler Corporation and at that time was in perfect health and free from any physical defect. On October 18, 1938, the Board overruled appellant's motion and at the same time awarded appellee temporary total disability benefits for a period of fifty-two weeks, less one week's waiting period, at the rate of $14.04 per week, and in addition, awarded him a 65 per cent partial temporary disability benefit for a period of 283 weeks at the rate of $7.80 per week beginning at the expiration of the award for total temporary disability. Appellant again appealed to the Bell Circuit Court, which, on April 12, 1939, set aside the award referred to and remanded the case to the Board with directions to permit the parties to take further proof.

The additional proof taken by the appellant consisted of the depositions of the employment manager, auditor, and examining physician for the DeSoto plant of the Chrysler Corporation, and by this testimony and the application for employment signed by appellee, the appellant established without contradiction that from September 30, 1936, appellee had been employed by the Chrysler Corporation continuously, except during shutdowns of the factory, at wages considerably in excess of those earned by him while in appellant's employ, and that his application, record, and medical examination disclosed that he was in perfect health, free from any bodily defect and capable of performing manual labor. The examining physician specifically stated that his examination disclosed no evidence that appellee had ever been affected by carbon monoxide; that his heart was of normal size and rhythm and without abnormalities of valvular action, and that " I found Mr. Hammons to be

in good health, good enough to be employed at hard physical labor; because we have that in mind. The work of the DeSoto plant is continuous and requires good, strong young males." The testimony further disclosed that in his application appellee had made numerous misstatements as to his previous employments. In his deposition taken in Detroit at or about the same time upon interrogatories propounded by appellant, appellee admitted making the application referred to, including the false statements relative to his previous employments, but stated that his employment by the Chrysler Corporation did not require him to perform manual labor, and that the medical examination made by that company's physician only consumed about twenty minutes. He failed, however, to describe the nature of his work or to make any statement relative to his physical condition during the period between the date on which he last testified in the compensation proceedings, December 7, 1934, and the time he secured employment in Detroit in September, 1936.

With this additional testimony the case was again submitted to the Workmen's Compensation Board, which thereupon awarded appellee compensation for temporary total disability at the rate of $14.04 per week for fifty-two weeks, less the waiting period of one week, and compensation for a 65 per cent partial disability at the rate of $7.80 per week from the expiration of the total disability period to September 15, 1936, plus $100 for medical expenses, and interest on all past instalments. Having unsuccessfully appealed to the Bell Circuit Court from this final award of the Board, the appellant has again appealed to this court.

Appellee filed his application for compensation in June, 1934, alleging that he had been injured on February 14, 1934. The referee to whom the application was referred dismissed it, holding that the evidence was not sufficient to show that appellee had sustained any injury from carbon monoxide, but, on the contrary, conclusively showed that the appellee's disabilities for which he sought compensation were the result of pre-existing disease. In view of our conclusion that the referee's finding was correct in the light of the subsequently established facts and our reluctance to set aside an award of the Board, we are impelled to set forth the history of this case from its inception.

In his original deposition appellee testified that he had been employed by appellant since June 1, 1927, and that "this kerosene business" was the only injury he had sustained, and that that had occurred "between the 1st and the 5th of February when they started burning kerosene that it weakened me down and got my physical strength sapped when I didn't feel like doing anything and I mosed around until the 14th of February and I had to leave." Asked to state in detail how he had met with this accident, appellee testified:

"Well sir, I was sweeping in the boiler room, and I was sweeping along between number two and number three boiler and back behind them, while they were burning this kerosene and the fumes was coming through this big door that leads from the engine room to the boiler room and while I was behind number three boiler sweeping I just felt weak and 1 turned sick at my stomach and I turned around to a wheelbarrow and I threw up everything I had eaten for two days at least."

Later in his testimony appellee also claimed that fumes emanating from ashes removed from the furnaces under the room in which he was working kept him "feeling pretty bad at times," and that he "Felt like vomiting two-thirds of the time and sometimes I did vomit"; and it is claimed that the fumes from the ashes contained carbon monoxide which contributed to appellee's disabilities. The "kerosene business" which appellee stresses as the major cause of his disabilities, consisted of the use by the company at intervals during the first and second weeks of February of a kerosene torch in its machine shop for the purpose of generating heat required in removing heavy steel wheels from the drive shafts, and the average amount of kerosene burned per day was from ten to fifteen gallons. The evidence shows that during this period appellee was working in a different room and approximately fifty feet from where the torch was burning, although occasionally his work brought him nearer to it; that other employees stationed nearer the torch sustained no injury, although some of them say that they were made sick temporarily; and that a door to the outside ten feet distant from the torch was kept open much of the time. There are other facts disclosed by the record which would indicate that the burning of the kerosene torch, under the circumstances

shown, did not and could not have generated carbon monoxide in quantities sufficient to have injured appellee. Likewise the proven facts negative the idea that carbon monoxide emanating from ashes could have injured appellee. But it is not necessary to theorize upon these subjects, or to discuss the expert testimony relating to it, since the question is not whether Hammons might have been so injured, but whether he was so injured.

Appellee's counsel strenuously argue that our conclusion on the former appeal that there was some competent evidence that appellee had been injured by inhaling the gas is conclusive on that subject, but it will be observed that on the rehearing we refrained from characterizing that evidence as substantial, and reversed the case for further hearing and determination whether appellee "sustained injury by' breathing carbon monoxide, and if so, to what extent he was disabled thereby". Moreover, it would not be necessary for appellee's counsel to attempt to invoke the "Law of the Case" rule if there was any medical testimony of a substantial nature showing that appellee had been so injured, as it is the fixed policy of this court to uphold the Board's findings of fact when they are supported by relevant evidence sufficient to support a conclusion.

Without in any way impugning the good faith or integrity of appellee's sole medical witness, Dr. Edward Wilson, upon whose evidence, as we said in our former opinion, "[appellee] must largely depend to sustain his claim", we are nevertheless compelled to hold in the light of the subsequently developed facts that his testimony is not sufficient for that purpose. Dr. Wilson began treating appellee on the day he left appellant's employ, and found him suffering from a "respiratory trouble" and dilatation and murmuring of the heart with a temperature of 102 degrees, which he ascribed, from the history given him by appellee, to carbon monoxide poisoning. At the same time appellee had an infection in the blood stream which the physician, when he testified on July 21, 1934, stated was syphilis in its secondary stage. In the physician's opinion, this infection had existed prior to February 14, 1934. On October 31, 1934, Dr. Wilson again testified, repeating his statement that he had treated appellee for syphilis, having given him injections of Neosalvasan and mercurials.

He also stated that the treatment was not finished but that appellee was responding to it. On December 18, 1935, the last occasion on which he testified, Dr. Wilson stated that the tests for syphilis which he had caused to be made in March, 1934, showed a two plus Wasserman and a three plus Kahn, but that such tests were not conclusive. However, it is not necessary to determine whether appellee was actually suffering from syphilis, since, according to his own physician's statement, whatever the nature of the infection, it had existed prior to the alleged injury for which compensation was sought.

It, of course, could not be claimed that the respiratory affection, or blood stream infection which responded to the treatment for syphilis, could have been occasioned by carbon monoxide poisoning. Dr. Wilson admitted that the blood stream infection from which appellee was suffering could have affected his heart but ascribed the condition of that organ to carbon monoxide poisoning because of appellee's statement to him that the condition had come on suddenly. The great weakness disclosed in Dr. Wilson's testimony, however, was his frank admission that if he had had no history of the case he could not have told from the examination which he made that appellee's condition was due to carbon monoxide. The significance of that admission is emphasized by the fact that the history upon which Dr. Wilson so largely based his conclusion, failed to include such essential data as the dimensions of the rooms in the building where it is alleged carbon monoxide was generated, appellee's distance from the source of the gas, the quantity of kerosene burned, the amount of ventilation, and the condition of the other men who were stationed near the alleged source of the carbon monoxide. The injurious effects of the gas are largely limited by the quantities of fresh air with which it is mixed, and the evidence leaves no doubt that the physician did not have before him sufficient facts to diagnose appellee's illness as carbon monoxide poisoning in the absence of clinical evidence that he had inhaled the gas.

Moreover, neither Dr. R. B. Maw nor Dr. W. O. Johnson, who examined appellee at appellant's request and later testified, was able to discover the slightest evidence of carbon monoxide poisoning. Dr. Maw, who examined appellee on March 4, 1934, found him suffering

from active rhinitis, pharyngitis, and bronchitis, but no serious heart trouble. The heart was slightly enlarged and there was a slight murmur near the apex, but the enlargement he attributed to appellee's football playing and the slight murmur to the syphilitic infection which the blood test subsequently disclosed. This physician was emphatic in his statement that the heart condition he found in appellee would not impair his ability to perform any character of labor.

Dr. Johnson examined appellee on October 23, 1934, in the presence of Dr. Wilson and Dr. Maw and found him to be a well developed and well nourished man weighing 195 pounds. Except for the condition of the heart, he found no physical defect. We quote the following from this physician's detailed report of the examination:

"From the history, physical, and laboratory findings, and the absence of abnormal neurological findings, I do not believe that this patient has had carbon monoxide poisoning, nor do I believe he is subject to any lesion which may be attributed to such.

"Were it not for the change shown in his heart, I would not hesitate to state that he is a perfectly normal individual for his age, and I feel sure that the cardiac lesion which he presents has no bearing, and is in no way related to a probable carbon monoxide poisoning. The subjective symptoms which he manifests, I believe are the result of lowered margin of cardiac compensation or reserve, plus exaggeration of severity of symptoms on the part of the patient.

"What part the residual syphilitic lesion plays is problematical and cannot be accurately determined."

It is not sufficient answer to our present criticism of the evidence upon which appellee has sought to build his case, to point to the statement in our former opinion that there was some competent evidence to show that appellee had suffered some injury from breathing carbon monoxide. Even then, by modifying the original opinion on rehearing, we took pains to indicate that we did not regard that evidence as controlling. Since then it has been shown that Dr. Wilson was wholly wrong in

his conclusion that appellee had sustained a permanent disability of from 70 to 80 per cent. because of the condition of his heart, a conclusion apparently based upon the proposition that if appellee was injured by carbon monoxide it would result in permanent disability. What are we to conclude from the fact that appellee was in perfect health in September, 1936, and his failure to adduce any evidence whatsoever as to his condition since December 18, 1935? At the very time he was endeavoring to secure an award for total and permanent disabilities, he was receiving from his labor in Michigan wages far in excess of those he had earned in appellant's employ.

We are urged by appellee's counsel to consider our former opinions in which we have stated that we would not disturb fact findings of the Workmen's Compensation Board supported by any competent evidence. But if the language employed in our former opinions was susceptible to the construction which appellee's counsel place upon it, it is no longer to be so construed. In the case of American Rolling Mill Co. v. Pack et al., 278 Ky. 175, 128 S. W. (2d) 187, 190, this court not only pointed out that the burden of proof rested upon the plaintiff in a Workmen's Compensation Board case, but quoted with approval the opinion of the Supreme Court in the case of National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 S. W. 292, 59 S. Ct. 501, 83 L. Ed. 660, that ''evidence'' within the meaning of that term as used in statutes making conclusive the findings of fact of administrative boards means ''evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred'', and that ''substantial evidence is more than a scintilla'', and ''means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'', and ''must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.''

If evidence insufficient in quality to support a rational conclusion is nevertheless sufficient to support and make binding upon the courts a finding of fact by an administrative board, not only are the constitutional rights of litigants in jeopardy but the constitutional duty and power of the courts to administer justice is impaired.

.Judgment reversed, with directions to remand the case to the Workmen's Compensation Board for proceedings consistent with this opinion.