IN THE MATTER OF THE ARBITRATION BETWEEN NEW JERSEY BELL TELEPHONE COMPANY, A CORPORATION OF NEW JERSEY, APPELLANT ON APPEAL, v. COMMUNICATIONS WORKERS OF AMERICA, NEW JERSEY TRAFFIC DIVISION NO. 55, CIO, RESPONDENT ON APPEAL, AND BOARD OF ARBITRATION, ET AL., ADDITIONAL RESPONDENTS ON APPEAL, AND STATE OF NEW JERSEY, ADDED PARTY AND RESPONDENT ON APPEAL.

Argued September 11, 1950—Decided October 2, 1950.

356

360

*Messrs. Thomas Glynn Walker* and *Joseph Weintraub* argued the cause for appellant (*Mr. Frederick W. Nixon,* on the brief).

*Mr. Israel B. Greene,* and *Mr. Henry Mayer,* of the New York Bar, argued the cause for respondent, Communications Workers of America, New Jersey Traffic Division No. 55, CIO (*Messrs. Greene & Hellring,* attorneys).

*Mr. Benjamin C. Van Tine,* Deputy Attorney General, argued the cause for the respondent, State of New Jersey (*Mr. Theodore D. Parsons,* Attorney General).

The opinion of the court was delivered by

BURLING, J. Two appeals are involved, both of which have been taken by the New Jersey Bell Telephone Company (hereinafter referred to as "Company") from two judgments of the Superior Court, Appellate Division. The first of said judgments, entered August 8, 1950, modified and affirmed, as modified, an order of a Statutory Board of Arbitration (hereinafter referred to as "Board"), which order was made pursuant to the provisions of *L.* 1946, *c.* 38, as amended and supplemented by *L.* 1947, *c.* 47 and *c.* 75, *L.* 1949, *c.* 308 and *L.* 1950, *c.* 14 (*N. J. S. A.* 34:13B–1 *et seq.*), and awarded, *inter alia,* a wage increase, union security, in the form of maintenance of membership, check-off and a modified union shop, and a partial reclassification of various cities included in wage zones in which wage schedule differentials

existed. The second of said judgments, entered August 14, 1950, denied a motion made by the Company for leave to take additional testimony in connection with the Board's order and various alleged irregularities therein with reference to the Findings of Fact, Decision and Order. The two appeals were consolidated for argument and hearing on appeal and will be disposed of together.

The pertinent facts giving rise to the present appeals are as follows:

The Company is a public utility corporation incorporated under the laws of the State of New Jersey; the Communications Workers of America, New Jersey Traffic Division No. 55, CIO (hereinafter referred to as "Union") is the collective bargaining agent of all the non-supervisory employees in the Company's Traffic Department, having been certified as such by the National Labor Relations Board; there are approximately 10,000 such employees in the Traffic Department who, for the most part, are telephone operators; on May 10, 1949, the collective bargaining contract, being the last of a series of annual contracts, between the Company and the Union expired; a dispute arose between the parties involving the terms and conditions to be included in a new contract; pursuant to the provisions of sections 8 to 12 of L. 1946, c. 38, then in effect but since repealed by L. 1950, c. 14, a fact-finding panel was established to hear the issues in dispute and to make recommendations for resolving the same; the panel made its recommendations on February 20, 1950, but the Company and the Union rejected the recommendations; no agreement was reached by the parties; the Governor, on March 1, 1950, pursuant to the statute, seized the plant, equipment and facilities of the Company and on March 3, 1950, appointed three persons and confirmed the designation of one person each by the Company and the Union to serve as members of the Board, to hear and determine the dispute, pursuant to the provisions of the statute; the Board conducted hearings with respect to the matters in dispute and concluded the hearings on March 28, 1950; the Order of the Board was

dated April 19, 1950, and was filed with the Governor on April 20, 1950; the Order was signed by the five members of the Board but contained endorsements to the effect that as to certain specified items of the Order the Union member dissented and as to certain specified items of the Order the Company member dissented; the "Findings of Fact and Decision" of the Board was not filed until May 25, 1950, or five weeks after the Order had been filed; it was signed by the three public members and the Union member, but the signature of the Union member was accompanied with the following notation: "Except as indicated in accompanying Dissenting Opinion"; on the same day, May 25, 1950, the Company member filed a "Dissent and Findings" and the Union member filed a "Dissenting Opinion"; the order disposed of numerous items in dispute and, *inter alia,* awarded a wage increase, union security, in the form of maintenance of membership, check-off and a modified union shop, and a partial reclassification of various cities included in wage zones in which wage schedule differentials existed; the Company appealed from the above specified awards of the Order and also moved for leave to take testimony to establish that certain alleged irregularities had been committed by the Board with respect to the Findings of Fact and Decision and Order; no appeal was filed by the Union; the Appellate Division, by its judgment of August 8, 1950, modified the Order so as to make the provision thereof granting a wage increase effective as of April 20, 1950, instead of April 16, 1950, as contained in the Order, and, as modified, affirmed the Order; the Appellate Division by its judgment of August 14, 1950, denied the Company's motion; the Company filed appeals from both judgments; the Attorney General of the State of New Jersey made a motion that the State of New Jersey be admitted as a party to the appeal and the motion was granted by this Court.

The questions involved will be dealt with in the following manner:

## I.

### CONSTITUTIONALITY OF STATUTE.

█ The Company challenges the constitutionality of the state statute dealing with labor disputes in public utilities. L. 1946, c. 38, as amended and supplemented by L. 1947, c. 47 and c. 75, L. 1949, c. 308, and L. 1950, c. 14 (*N. J. S. A.* 34:13B–1 *et seq.*). The Union, *in limine,* argues that the Company is estopped from questioning the constitutionality of the statute by reason of its participation in the procedure provided by the statute. The Union states that this question was raised and argued before the Appellate Division but was not decided. The Union's argument is based upon the principle stated in *United Fuel Gas Co. v. Railroad Commission,* 278 *U. S.* 300, 73 *L. Ed.* 390 (1929), "That one who has invoked action by state courts or authorities under state statutes may not later, when dissatisfied with the result, assail their action on the theory that the statutes under which the action was taken offend against the Constitution of the United States." It is sufficient to say that the principle is inapplicable to the present case because the proceedings under the statute were not initiated by the Company but were invoked by the Governor. The Company was required by the mandate of the statute to participate in the prescribed proceedings.

### A.

### INVASION OF A PRE-EMPTED FIELD.

The Company's first contention is that the statute is unconstitutional because it invades a field pre-empted by the Federal Government through the enactment of the National Labor Relations Act, 29 *U. S. C. A.,* § 151 *et seq.,* and the Labor-Management Relations Act, 1947, 29 *U. S. C. A.,* § 141 *et seq.* This question was fully explored and disposed of by this court in *Van Riper v. Traffic Telephone Workers Federation*

*of N. J.,* 2 *N. J.* 335 (1949), wherein we decided that our state statute was not in conflict with federal legislation. The Company argues, however, that since our decision on this point in the *Van Riper case, supra,* the United States Supreme Court, in *International Union of U. A. A. & A. v. O'Brien,* 339 *U. S.* 454, 94 *L. Ed.* (*Adv. Op.*) 659 (May 8, 1950), has decided that the right to strike peacefully for higher wages is established by the federal legislation, that the latter does not permit concurrent state regulation in this area, that since Congress has occupied this field it is closed to state regulation, and, *ergo,* that our state statute is unconstitutional.

Our analysis of the *O'Brien case, supra,* does not lead us to the same conclusion. In that case the constitutionality of the strike vote provision of the Michigan labor mediation law was questioned. The union had struck against a private industrial organization, engaged in interstate commerce, without conforming to the prescribed state procedure; the state procedure differed from that provided in the federal legislation and the court decided that because of the conflict the state statute was unconstitutional. The court said that the regulation of the right to peacefully strike for higher wages had been pre-empted by Congress, but the case being decided by the court involved a statute regulating the right to strike against private industry. It was not a statute such as the New Jersey statute, in which a state, in the exercise of its sovereignty, seeks to maintain without interruption the supply of services, considered essential to the welfare and health of its people, being furnished by a public utility, operating under a franchise by the state, whose services furnished are primarily intrastate. It is significant that in the *O'Brien case, supra,* the court said, "Even if some state legislation in this area could be sustained, the particular statute before us could not stand. For it conflicts with the Federal Act." Our examination of the federal act discloses no provision therein which prohibits a state, in the exercise of its police power, from protecting itself against strikes or lockouts in public utilities which would imperil the health and safety

of its citizens. It is noted that the Labor-Management Relations Act, 1947, in sections 206–210, authorizes the Federal Government to proceed, pursuant thereto, to enjoin threatened strikes or lockouts which, if permitted to occur, might imperil the national health or safety. We find no authority in the federal act for the Federal Government to so act to prevent similar emergencies which may be state-wide only and which may be of insufficient magnitude to imperil the national health and safety. Since we find no provision in the federal act prohibiting a state from enjoining threatened strikes or lockouts in public utilities which, if permitted to occur, might imperil the health, welfare and safety of its people in an emergency of state-wide proportions only, since the federal act does not authorize the Federal Government to act in such cases, and since the "intention of Congress to exclude states from exerting their police power must be clearly manifested," *Allen-Bradley Local v. Wisconsin Employment Relations Board*, 315 *U. S.* 740, 86 *L. Ed.* 1154 (1942), we conclude that the right of the states to prohibit strikes or lockouts in this sphere has not been pre-empted by Congress, and that the *O'Brien case, supra,* is inapplicable to the present situation.

We reiterate the statement made in the *Van Riper case, supra,* that "Thus the power still resides in the states in a proper case to prohibit strikes notwithstanding the existing federal legislation." We consider this a "proper case" within the foregoing statement and find nothing in the *O'Brien case, supra,* of a dissuasive nature.

### B.

### UNION SECURITY.

The Company next contends that the Order of the Board awarding a modified union shop is in conflict with the Federal Labor-Management Relations Act, 1947. We are in accord with this contention. The Company is engaged in interstate commerce, albeit the services rendered by it are predominantly

intrastate, and accordingly, the Federal Act is applicable to it. The Federal Act is predicated upon the philosophy of collective bargaining which is the antithesis of compulsion. Section 8(a)(3) of the Federal Act provides that under certain conditions therein delineated, the employer shall not be precluded "from making an agreement with a labor organization," where the qualified number of employees have voted to authorize such labor organization "to make such an agreement" for a union shop.

■ ■ Clearly the expressed attitude of Congress is that a union shop to be lawful must result from an agreement. It necessarily follows that the creation of a union shop by compulsion is repugnant to the letter and the spirit of the Federal Act. Even under the National Labor Relations Act, popularly known as the Wagner Act, an employer could not be required to enter into a union security agreement. In labor disputes which arose during the war, in which the union security question was raised, the matter was usually disposed of by the National War Labor Board's issuing a directive order for maintenance of membership and check-off. It is observed that directive orders of the National War Labor Board were merely advisory and not mandatory. See *Employers Group, etc., v. National War Labor Board,* 143 *F.* 2d 145, 148 (*C. of A. D. C.* 1944); *National Labor Relations Board v. Andrew Jergens Co.,* 175 *F.* 2d 130, 134 (*C. of A., Ninth Circuit,* 1949). It is also noted that under section 302 of the Federal Labor-Management Relations Act, 1947, it is made illegal for an employer to check-off union dues or for a labor union to accept the same except pursuant to written assignment from the employee. The award of the Board in the present case *requires,* in addition to maintenance of membership and check-off, that all employees with less than 10 years of service at the date of the Order become members of the Union and that all new employees (including any former employees who shall be re-engaged) become members of the Union within 30 days of employment. The only employees excluded from the requirement that membership in

the Union be a condition of continued employment are those, not presently members of the Union, with service of 10 or more years. The award, thus, is but a very slightly modified version of a full union shop, under which some employees possibly against their own wishes as well as those of the Company are compelled to become members of the Union.

We do not find in our state statute any provision specifically authorizing the submission of the question of union security as one of the labor disputes subject to compulsory arbitration, nor do we find any direct authority therein for the Board to determine this question. The statute defines "labor dispute" as "any controversy between employer and employees as to hours, wages, and working conditions." It is true that the question of union security is generally considered to be included as a working condition in the negotiation of collective bargaining agreements but it is not clear that the Legislature intended to include it as a working condition in the present statute which requires compulsory arbitration of labor disputes in public utilities where necessary to preserve a continuous flow of services essential to the health and welfare of the people of the State. A construction of the term "working conditions" to include the question of union security in our compulsory arbitration statute would of necessity result in the statute's being *pro tanto* in conflict with the federal act which premises the question of union security on collective bargaining and not compulsion. The design of the statute is to empower the State to perform such acts as are necessary to maintain essential services in the public interest. A requirement that employees be compelled to become or remain members of a labor organization is not deemed to be a necessary act incident to the maintenance of essential services. Accordingly, it is our judgment that the statute does not contemplate compulsory arbitration of the union security question. This leads to the conclusion that the question of union security was not a proper issue before the Board and that the Board's order awarding union security was without jurisdiction under the statute and is in conflict with the letter

and the spirit of the federal act which premises the question of union security upon collective bargaining and not compulsion.

## C.

### STANDARDS.

The Company challenges the standards embodied in the statute as an improper delegation of legislative power. The statute as originally passed contained no standards. In *Van Riper v. Traffic Tel. Workers' Fed. of N. J., supra,* Chief Justice Vanderbilt, speaking for the court, said, "While there is no doubt that the Legislature may delegate to an administrative body the exercise of a limited portion of its legislation power with respect to some specific subject matter, such delegation of legislative power must always prescribe the standards that are to govern the administrative agency in the exercise of the powers thus delegated to it." Subsequent to the decision in the *Van Riper case, supra,* the Legislature gave cognizance to the opinion, by inserting the present standards, by amending the statute, *L.* 1949, *c.* 308 (*N. J. S. A.* 34:13B-27). It is contended that the standards are vague, illusory, insufficient and arbitrary. We do not agree with the Company's contention. It is, of course, requisite that the delegation of legislative power prescribe the standards that are to govern the administrative agency in the exercise of such delegated power, but "it is only necessary that the statute establish a sufficient basic standard—a definite and certain policy and rule of action for the guidance of the agency created to administer the law." *State Board of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504 (*E. & A.* 1935). The statute as amended, *L.* 1949, *c.* 308 (*N. J. S. A.* 34:13B-27(b)), provides:

"* * * the board shall make a just and reasonable determination of the dispute, and in determining such issues, base its findings of fact, decision and order upon the following factors:

"(1) the interests and welfare of the public.

"(2) Comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceedings, and the wages, hours and conditions of employment of employees doing the same, similar or comparable work or work requiring the same, similar or comparable skills and expenditure of energy and effort, giving consideration to such factors as are peculiar to the industry involved.

"(3) Comparison of wages, hours and conditions of employment as reflected in industries in general and in public utilities in particular throughout the nation and in the State of New Jersey.

"(4) The security and tenure of employment with due regard for the effect of technological changes thereon as well as the effect of any unique skills and attributes developed in the industry.

"(5) Such other factors not confined to the foregoing which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining arbitration or otherwise between the parties or in the industry."

The standards prescribed by the statute are adequately definitive and are within the requirements of a proper delegation of legislative authority as construed by the courts. Some of the standards are rather broad and general while others are most specific but many statutes containing only a general standard have been held sufficiently definitive. In *Lichter v. United States*, 334 *U. S.* 742, 92 *L. Ed.* 1694 (1948), Justice Burton, speaking for the Supreme Court, said at page 785 of the *U. S.* report:

"It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program. 'If Congress shall lay down by legislative act an intelligible principle * * *, such legislative action is not a forbidden delegation of legislative power.' *J. W. Hampton, Jr., & Co. v. United States*, 276 *U. S.* 394, 409, 72 *L. Ed.* 624, 630, 48 *S. Ct.* 348. Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied. They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear.' *American Power & L. Co. v. Securities & Exch. Commission*, 329 *U. S.* 90, 104, 91 *L. Ed.* 103, 115, 67 *S. Ct.* 133."

See also *Como Farms, Inc. v. Foran*, 6 *N. J. Super.* 306 (*App. Div.* 1950), wherein Judge Jacobs, at pages 311 and 312,

reviews a number of cases decided by the courts of this State in which statutes prescribing general standards were sustained. The force of the Company's criticism is directed against standards Nos. 2, 3 and 5. It is argued that standards Nos. 2 and 3 should be limited to the local labor market and it is pointed out that similar statutes in other states contain some limitation of this nature. This is a matter of legislative policy. It is not unusual for collective bargaining to be premised on conditions existing in the particular industry without territorial limitation, especially where there are no similar or competitive industries in the local area. This is certainly applicable to public utilities which by nature are monopolies in their respective local areas. Standard No. 2 clearly limits a comparison of wages, hours and conditions of employment of employees doing the same, similar or comparable work. Standard No. 3 does not so limit the comparison to be made, but it is a proper standard to be considered in conjunction with the other standards in arriving at a just and reasonable determination of the dispute. We see no objection to this standard which seeks to ascertain the balance existing in a particular utility and "in industries in general and in public utilities in particular." Standard No. 5 is criticised as being a "catch-all" which "emasculates any definitive direction which may exist in the remaining standards." It occurs to us that in the determination of a labor dispute nothing could be fairer than to require consideration of not only the specific items set forth in the statute but also, so far as possible, such other factors "which are normally or traditionally taken into consideration * * * between the parties or in the industry." Such a standard vests a measure of discretionary authority in the administrative agency but the vesting of such authority is within the legislative power. *State Board of Milk Control v. Newark Milk Co., supra.*

## II.

### ADJECTIVE.

*(a) Application of the standards as reflected in the Board's Findings of Fact and Decision.*

 ██ The statute requires the board of arbitration to make "written findings of fact" and requires that it base its findings of fact, decision and order upon the five standards therein set forth. Surely this means that all of the standards are to be given consideration by the Board so far as applicable to the matters in dispute. In determining the question of wages, for instance, obviously one of the five standards would be an insufficient criterion upon which to base an award, and yet a reading of the Board's Findings of Fact and Decision on this issue seems to indicate that the Board based its award of an increase in the wage rates solely upon standard No. 5 and relied heavily upon "trends." The Company criticises the Board's consideration of "trends" as a basis for the wage award. We agree that "trends" do not constitute proper items to be considered in arriving at "a just and reasonable determination" of a labor dispute. The objective of the proceedings provided for in the statute is to consider, by an application of the standards delineated therein to the evidence, the justness and reasonableness of the wages, in the particular labor dispute, existing at the time of the dispute and to make a determination accordingly. The employment of "trends" in the attainment of the objective is considered improper because "trends" are illusory. A "trend" is defined in *Webster's New International Dictionary, 2d edition,* 1947, as the "general direction taken by something changing or subject to change." A "trend" may change its direction at any time. If it progresses in one direction for a sufficient length of time it becomes more than a "trend"; it becomes an established thing which would be reflected in the existing conditions disclosed by the application of the standards specified in the statute, particularly standards Nos. 2 and 3. To predicate

a determination of what is just and reasonable, at the time a labor dispute is being resolved, upon something which has not as yet become established, but which, if established at some future time might possibly change existing conditions, either one way or the other, would be manifestly unfair to both parties involved in the dispute. Standards Nos. 2 and 3 contemplate a comparison of existing wages, but these two standards were not given consideration in the Board's findings, as is indicated by the language of the Board that—

"We are also satisfied that a 'comparison of wages' as required by Standards 2 and 3 involves not a static examination of the then existing wage structure particularly in an industry in which reasonably accurate comparison with other industry is admittedly not too illuminating, even as to the telephone industry itself. We are informed (Record, p. 1471) that negotiations with respect to wages are pending in every unit of the Bell System at the present writing. It appears to the Board that the illogical conclusion of the static construction of the word 'wages' urged upon us would be that the employees here involved could get no wage increase, however much it might be otherwise justified, and however probable it might be that shortly after our determination other units of the Bell System might grant substantial adjustments covering the period here under consideration, merely because this Company happens to be the first to be involved in such a proceeding. We have, therefore, concluded that we are entitled to consider wage movements in other industries for the period since May, 1948."

The province of the Board is to apply the standards prescribed by the statute and after such application to reach a conclusion based thereon. This the Board has not done, but has excluded the consideration of some of the required standards. The United States Supreme Court refused to sustain an order of the Interstate Commerce Commission adjusting rates where the Commission failed to consider the items definitely specified in the Transportation Act. *Brimstone R. & C. Co. v. United States*, 276 *U. S.* 104, 72 *L. Ed.* 487 (1928).

### (b) Absence of basic findings of fact.

Nor does the Board's Findings contain sufficient factual data for us to determine whether the Board's conclusions

are predicated upon facts or speculation, and if upon facts, what facts. The requirement of findings is far from a technicality and is a matter of substance. It has been said that it is a fundamental of fair play that an administrative judgment express a reasoned conclusion. *Federal C. C. v. Pollsville Broadcasting Co.*, 309 *U. S.* 134, 84 *L. Ed.* 656 (1940). A conclusion requires evidence to support it and findings of appropriate definiteness to express it. A leading case on the subject is *Saginaw Broadcasting Co. v. Federal C. Com'n.*, 96 *F.* 2d 554 (*U. S. Ct. App. D. C.* 1938) ; *cert.* denied, *sub. nom. Gross v. Saginaw Broadcasting Company*, 305 *U. S.* 613, 83 *L. Ed.* 391 (1938), wherein the court details the requirements of findings of fact by *quasi*-judicial authorities. On page 559 of the opinion, it is said:

"The requirement that courts, and commissions acting in a *quasi*-judicial capacity, shall make findings of fact, is a means provided by Congress for guaranteeing that cases shall be decided according to the evidence and the law, rather than arbitrarily or from extralegal considerations; and findings of fact serve the additional purpose, where provisions for review are made, of apprising the parties and the reviewing tribunal of the factual basis of the action of the court or commission so that the parties and the reviewing tribunal may determine whether the case has been decided upon the evidence and the law or, on the contrary, upon arbitrary or extralegal considerations. When a decision is accompanied by findings of fact, the reviewing court can decide whether the decision reached by the court or commission follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have any substantial support in the evidence. In the absence of findings of fact the reviewing tribunal can determine neither of these things. The requirement of findings is thus far from a technicality. On the contrary, it is to insure against Star Chamber methods, to make certain that justice shall be administered according to the facts and law. This is fully as important in respect of commissions as it is in respect of courts.

"In discussing the necessary content of findings of fact, it will be helpful to spell out the process which a commission properly follows in reaching a decision. The process necessarily includes at least four parts: (1) evidence must be taken and weighed both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion."

In one of the oft-quoted cases, *Florida v. United States,* 282 *U. S.* 194, 75 *L. Ed.* 291 (1931), it was said that in the absence of basic or essential findings to support an order of the Interstate Commerce Commission, the evidence would not be examined in order to resolve opposing contention. That philosophy was followed in *Atchison T. & S. F. R. Co. v. United States,* 295 *U. S.* 193, 79 *L. Ed.* 1382 (1935), wherein the court said, at page 201 of the *U. S.* report:

> "This court will not search the record to ascertain whether, by use of what there may be found, general and ambiguous statements in the report intended to serve as findings may by construction be given a meaning sufficiently definite and certain to constitute a valid basis for the order. In the absence of a finding of essential basic facts, the order cannot be sustained. *Florida v. United States,* 282 *U. S.* 194, 215, 75 *L. Ed.* 291, 305, 51 *S. Ct.* 119. Recently this court has repelled the suggestion that lack of express finding by an administrative agency may be supplied by implication. *Panama Ref. Co. v. Ryan,* 293 *U. S.* 388, 433, *ante* 446, 465, 55 *S. Ct.* 241. See *Beaumont, S. L. & W. R. Co. v. United States,* 282 *U. S.* 74, 86, 75 *L. Ed.* 221, 229, 51 *S. Ct.* 1; *Interstate Commerce Commission v. Chicago, B. & Q. R. Co.,* 186 *U. S.* 320, 341, 46 *L. Ed.* 1182, 1193, 22 *S. Ct.* 824."

See also, to similar effect, *National Labor Rel. Bd. v. Fansteel Metal Corp.,* 306 *U. S.* 240, 83 *L. Ed.* 627 (1939); *National Labor Rel. Bd. v. Virginia E. & P. Co.,* 314 *U. S.* 469, 86 *L. Ed.* 348 (1941); *Securities and Exchange Com. v. Chenery Corp.,* 318 *U. S.* 80, 87 *L. Ed.* 626 (1943); *Colorado-Wyoming Gas Co. v. Federal P. Com.,* 324 *U. S.* 626, 89 *L. Ed.* 1235 (1945); and *Interstate Commerce Commission v. Parker,* 326 *U. S.* 60, 89 *L. Ed.* 2051 (1945).

The courts of this State have not been silent with respect to the necessity of specific findings and determination of facts by administrative agencies. See *Penna. R. R. Co. v. N. J. State Aviation Com..* 2 *N. J.* 64 (1949); *Gianfrancisco v. Public Service, etc., Transport,* 11 *N. J. Misc.* 219 (*Sup. Ct.* 1933); *Rojeski v. Pennington Dairy Farms, Inc.,* 118 *N. J. L.* 335 (*Sup. Ct.* 1937); and *Hughes v. N. J. State Highway Dept.,* 129 *N. J. L.* 273 (*Sup. Ct.* 1942).

Clearly it is the function of the administrative authority and not the courts to find the facts. Findings must

be free from ambiguity which raises a doubt as to whether the administrative authority proceeded upon a correct legal theory. The most reasonable and practical standard is to require that findings of fact be sufficiently specific under the circumstances of the particular case to enable the reviewing court to intelligently review an administrative decision and ascertain if the facts upon which the order is based afford a reasonable basis for such order. This is a necessary rule where, as here, the findings of fact are conclusive upon review, if supported by evidence. See 146 *A. L. R.* 209 *et seq.*

The statute as amended *L.* 1947, *c.* 47 and *c.* 75 (*N. J. S. A.* 34:13B–23) provides for judicial review of the Board's findings, decision and order, but also provides that "In any such appeal the findings of the Board of Arbitration upon the facts, if supported by any evidence, shall be conclusive." Obviously the words "any evidence" means more than a scintilla of evidence and the meaning to be attributed thereto must be in accord with accepted judicial construction. The Labor-Management Relations Act, 1947, uses the words "substantial evidence" but its predecessor statute used only the word "evidence" and yet the cases decided under the National Labor Relations Act construed "evidence" to mean "substantial evidence." In *National Labor Rel. Bd. v. Columbian E. & S. Co.,* 306 *U. S.* 292, 83 *L. Ed.* 660 (1939), the court said, at page 299 of the *U. S.* report:

"Section 10 (e) of the Act provides: '* * * The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. (Citing cases.) Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 *U. S.* 197, * * *."

In *Foster v. Goodpaster,* 290 *Ky.* 410, 161 *S. W.* 2d 626, 140 *A. L. R.* 1044 (*Ct. App.* 1942), the court expressed the rule in the following manner at page 1046 of 140 *A. L. R.:*

"* * * an express provision that an administrative body's finding of fact shall be conclusive is subject to the qualification that it must be supported by relevant evidence such as a reasonable mind might accept as adequate to support a conclusion. *National Labor Relations Board v. Columbia Enameling & Stamping Co., Inc.*, 306 *U. S.* 292, 59 *S. Ct.* 501, 83 *L. Ed.* 660; *Kentucky Utilities Co. v. Hammons*, 284 *Ky.* 437, 145 *S. W.* 2d 67."

Although the Board is not bound by the strict rules of evidence it is still necessary that the evidence supporting an award be competent. This court has followed the rule, long established in this State, that an award in workmen's compensation cases must be supported by competent evidence, see *Andricsak v. National Fireproofing Corp.*, 3 *N. J.* 466 (1950), citing *Helminsky v. Ford Motor Co.*, 111 *N. J. L.* 369 (*E. & A.* 1933). The same rule has been held applicable to rate cases. See *Public Service Coordinated Transport v. State*, 5 *N. J.* 196, 223 (1950). The Board in the present case recognized the general rule that a preponderance of evidence is necessary to sustain the burden of proof, for, in considering one of the issues before it, the Board said: "There is no satisfactory preponderance of evidence * * *."

The statute is interpreted to mean that the Board's findings upon the facts shall be conclusive if supported by substantial evidence; the additional requisites to support an award, of course, are that the evidence be competent and relevant.

It follows that if the findings of the administrative authority are supported by substantial, competent, relevant evidence the findings of fact shall be conclusive on judicial review and the courts will not substitute their judgment for that of the administrative authority.

The difficulty in the present case, as previously stated, is that the Board has not made adequate basic or essential findings to support its conclusions, and it is not appropriate for us to make independent findings of fact under *Rule* 1:2–20(a) because the Legislature contemplated that facts in the specialized field of employer-employee relations should be found by those of experienced judgment in a highly

complex area. That this was the intention of the Legislature is clearly expressed by the conclusive nature of the findings of the Board, subject only to the limitation that they be supported by substantial, competent and relevant evidence. An application of the law leads to the inevitable conclusion that the Board's Findings of Fact and Decision do not contain the essential or basic facts necessary to support its conclusion with reference to the wage increase and hence, are insufficient to enable us to properly perform our function. It may well be that the evidence submitted to and considered by the Board would justify the conclusion, but the Board's findings are inadequate to sustain the conclusion. We find the same situation to exist with respect to the Board's findings on the issue of the wage zone. Our determination that the question of union security was not a proper one for compulsory arbitration eliminates the necessity of any further discussion of.that item.

### (c) Relationship of written findings to the Order.

The Company contends that the Order of the Board is void because of various alleged irregularities committed by the Board in its consideration and determination of the matter, and that the denial of its motion to take testimony to prove the irregularities was a denial of due process.

The record clearly shows that while the Board's Order was dated April 19, 1950, and was filed on April 20, 1950, the Findings of Fact and Decision of the Board were not filed until five weeks later, on May 25, 1950. The Order does not recite that written findings of fact had been made prior to the signing of the Order. It was conceded that findings of fact must precede the making of an order thereon and on the oral argument counsel for the Union stated that the Order could not be effective until the findings of fact were filed, May 25, 1950, but it is argued that oral factual findings were made prior to April 19, 1950, the date of the Order, although they were not reduced to writing until afterward and were

not filed until five weeks later. The statute expressly requires written findings of fact to be made and refers to "findings, decision and order" in that sequence. It is of the essence of the statute and substantial reason exists and dictates that the legislative intent is that the making of written findings must precede the making of the order. The statute further provides that "* * * The findings of fact, decision and order * * * shall forthwith be filed by such board with the Governor * * *." Unless the written findings of fact precede the making of the order, opportunity is presented to "back into an order" through the expedient of drafting findings of fact to support an order previously made. As a matter of public policy this opportunity should be prevented. The dispute existing in the present case regarding the making of oral findings, as to time, manner and content, is a clear illustration of the reason for such a policy. The preparation and filing of the present order five weeks prior to the making and filing of the written findings of fact by the Board contravenes the orderly process contemplated by the statute to insure substantial justice.

It is apparent on the record that the Board did not comply with the statutory procedure in these substantial particulars and for this additional reason the Board's order cannot be sustained.

It is to be observed that the statute contemplates that the findings of fact shall be the product of deliberation and conference of all members of the Board to the end that their views and reasoning be considered by the other members in reaching a determination. It is not clear that this was so in this case. See the conflicting statements appearing in Findings of Fact and Decision of the majority of the Board (Appendix to Appellant's Brief, p. 9a) and the Dissent and Findings of the Industry member of the Board (Appendix to Appellant's Brief, *p. 72a et seq.*). The logic and necessity of joint deliberation is considered in *Lloyd v. Moore*, 1 *N. J. L.* 167 (*Sup. Ct.* 1792); *Barr v. Chandler*, 47 *N. J. Eq.*

523 (*Ch.* 1890); *McAlpine v. Garfield Water Commission,* 135 *N. J. L.* 497 (*E. & A.* 1947).

CONCLUSIONS.

For the reasons heretofore stated we hold the objections to the statute, relating to its constitutionality, to be without merit.

The statute was improperly applied by the Board in relation to the compulsory award of union security.

The adjective matters which are far from technicalities but are errors in substance are dealt with at length in the opinion.

For the reasons set forth in this opinion, the judgment of the Appellate Division, entered August 8, 1950, adjudging that the Order of the said Board of Arbitration be modified and as so modified affirmed, is reversed, without costs, and the case is remanded to the Superior Court, Appellate Division, to be remanded by it to the Board of Arbitration to make its written findings, decision and order consistent with this opinion. In doing so, the Board may take additional evidence to be considered with the evidence already taken. This course is regrettable as we are conscious of the lapse of time since the expiration of the contract between the Company and the Union on May 10, 1949, albeit the movement of the matter since the initiation of the statutory proceedings has been expeditious.

This disposition renders it unnecessary to consider the appeal from the judgment of the Appellate Division, entered August 14, 1950, denying the motion to take testimony, as the questions therein raised are moot. The appeal from such judgment is accordingly dismissed, without costs.

Heher, J., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, BURLING and ACKERSON—6.

*For affirmance*—Justice WACHENFELD—1.