**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4010-19

ALEX ROSA,

     Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

Argued November 29, 2021 – Decided December 20, 2021

Before Judges Messano, Accurso and Enright.

On appeal from the New Jersey Department of Corrections.

Remi L. Spencer argued the cause for appellant.

Chanell M. Branch, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Chanell M. Branch, on the brief).

PER CURIAM

Petitioner Alex Rosa, an inmate at Bay State Prison, appeals from a May 6, 2020 final agency decision of the New Jersey Department of Corrections (DOC), which upheld an adjudication and sanctions for committing prohibited act *.252, encouraging others to riot, N.J.A.C. 10A:4-4.1(a).[1] We vacate the determination and remand for further proceedings.

Rosa's charge stems from an incident that occurred when he was an inmate at Southern State Correctional Facility (SSCF). In April 2020, he was part of an inmate group housed in Unit 2R at SSCF, a unit designated as a temporary "quarantine unit" to house inmates who were determined to have been in "close contact" with an inmate or staff member persons who exhibited symptoms associated with COVID-19. On April 9, 2020, the first inmates were relocated into the unit without incident. At approximately 9:20 p.m., while the remaining inmates were being transferred into the unit, a disturbance broke out. The incident was captured on the prison's video system cameras and recorded without sound.

---

[1] In January 2021, the DOC adopted amendments to Title 10A Chapter 4 Inmate Discipline. One of the amendments consolidated prohibited act *.252 encouraging others to riot with *.251 rioting. As such, the current administrative code reads "*.251 rioting or encouraging others to riot[.]" See N.J.C.A. 10A:4-4.1(a)(1) (2021); 53 N.J.R. 923(a) (May 17, 2021).

A-4010-19

Major Floyd Cossaboon, who was called in to respond to the disturbance, summarized the incident, in part, as follows:

> At approximately [9:20 p.m.], as the last movement of [twelve] inmates entered Unit 2R, the inmates (a total of [sixty-three]) housed on Unit 2R[,] flooded the day-space on the right side of the unit and began yelling, cursing, and threatened the [twelve] inmates entering the unit to not enter the tier.  Those [twelve] inmates were removed temporarily from the unit. . . .
>
> At [9:30 p.m.] the institutional "Lock Up" was called for the whole facility.[2]  Inmates on Unit 2R refused to leave the day-space and report to their wings for count to be conducted.  They remained in the day-space, watching TV, using the kiosks, and remained on the phones.  At approximately [9:40 p.m.] inmates on Unit 2R can be observed pushing a picnic table up against the tier gate.  At this time [Lieutenant] Ernest was still in the unit and advised all inmates housed on [U]nit 2R that if they were not participating in the refusing to count and unit-wide disturbance they were to go down [to] their wings and remain on their assigned bunks.  At no time was any inmate observed to have counted up as ordered and remain on their assigned bunk.  Unauthorized entering and exiting of the day-space and usage of the phones and kiosks contributed to the inmate action and further compromised the safe and orderly running of the institution.

---

[2]  According to Major Cossaboon, a "lock-up" order requires inmates to "leave the day-space, go down [to] their wings, and get on their bunks until count has been conducted and cleared."

A-4010-19

Major Cossaboon went to SSCF at approximately 10:00 p.m. and watched the incident transpire via display monitors. He stated he saw "inmates from every wing milling about the unit. There were no wings that were not participating in their refusal to leave the day-space and 'count up.' Throughout the incident I was able to observe movement into/out of the day space from all [six] wings." Major Cossaboon further noted that "[m]any of the inmates were wearing surgical masks . . . and others were wearing altered clothing items . . . to cover their faces[,] making it difficult to recognize and identify a specific inmate."

Lieutenant Chard described the incident similarly in his disciplinary report against Rosa, stating, "[a]ll inmates were given numerous orders to disperse and allow entrance to the tier, and present themselves to be removed from [U]nit 2[R; the orders] all were ignored." The record reflects additional officers entered the unit at 12:35 a.m. and ordered the inmates to their bunks. By 3:30 a.m. on April 10, all sixty-three inmates were secured, processed, and transported to a different prison facility.

Rosa was served with the *.252 charge and proceeded to a hearing on April 30, 2020. He was granted confrontation with Corrections Officers Russo and Valentine, and Lieutenant Ernest, whose collective descriptions of the

incident were consistent with Major Cossaboon's and Lieutenant Chard's reports. Through his substitute counsel, Rosa denied the charge, stating he "didn't know what was happening . . . [and] went to [his] wing" when the disturbance broke out. An unidentified inmate also attested that Rosa retrieved food for him but was "back down [in] his wing by the time it was count[.]" The record does not specify when Rosa purportedly returned to his wing on April 9.

After considering the testimony and reviewing the evidence, the hearing officer issued a written decision, finding Rosa guilty of encouraging a riot. She stated she relied on Lieutenant Chard's disciplinary report, as well as video evidence, which "clearly show[ed the] majority of inmates congregating in the dayroom, disobeying orders and rules given." Further, she found that Rosa's defense was "not supported" because "standing out on the wing, is not being on your bunk for count, which is adding to the overall chaos and rioting behavior." The hearing officer also concluded:

> <u>While it is not known what each inmate's specific role was in the disturbance</u>, the evidence supports that:
>
> 1. [Rosa] was part of a group that received orders. (PA system announced count up at 9:30 [p.m.])[;]
>
> 2. The orders were of such a nature that any reasonable person would have understood the orders[] (inmates were given several orders from officers [and] [L]ieutenant to go down [to] their wings)[;]

3. The orders were loud enough that the entire group could have heard the orders[;]

4. [Rosa] had ample time to comply with the order[;]

5. No inmate, after receiving warnings, complied with staff orders (video shows inmates did not disperse)[;] [and]

6. [Rosa] was part of the group as evidenced by the escort reports[.]

[(Emphasis added).]

Additionally, the hearing officer stated,

Staff reports they cannot identify any inmates not involved in the incident. . . . Any behavior that is not compliant with staff orders can be viewed as encouraging and inciting non-compliant behaviors. . . .

. . . .

In prison culture, said behaviors must be taken extremely seriously and cannot be tolerated. Inmates['] behaviors could have led to violence and injuries for staff and inmates. Orders are mandatory and must be followed immediately. Inmates['] actions caused S[pecial] O[perations] G[roup], central transportation, [and] the K[-]9 . . . unit[] to be dispatched and mass overtime as the entire second shift was mandatory due to this incident. Said behaviors cannot be tolerated and any future behavior of this type must be deterred for safety and security purposes. Prison[]s function on order.

[(Emphasis added).]

A-4010-19

Rosa was sanctioned to 210 days of administrative segregation, a ninety-day loss of commutation time, and a ten-day loss of recreation privileges. The DOC affirmed the hearing officer's decision on May 6, 2020.

On appeal, Rosa argues the "hearing officer's finding of guilt on the charge of riot was not supported by substantial evidence and therefore it must be reversed."

Our scope of review of an agency decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011); Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 190 (App. Div. 2010). "We defer to an agency decision and do not reverse unless it is arbitrary, capricious[,] or unreasonable or not supported by substantial credible evidence in the record." Jenkins v. N.J. Dep't of Corr., 412 N.J. Super. 243, 259 (App. Div. 2010) (citing Bailey v. Bd. of Rev., 339 N.J. Super. 29, 33 (App. Div. 2001)).

As we have long recognized, "[p]risons are dangerous places, and the courts must afford appropriate deference and flexibility to administrators trying to manage this volatile environment." Russo v. N.J. Dep't of Corr., 324 N.J. Super. 576, 584 (App. Div. 1999). A reviewing court "may not substitute its own judgment for the agency's, even though the court might have reached a different result." Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474,

483 (2007)). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 195 (quoting In re Herrmann, 192 N.J. 19, 28 (2007)).

But our review is not "perfunctory[,]" nor is "our function . . . merely [to] rubberstamp an agency's decision[.]" Figueroa, 414 N.J. Super. at 191 (citation omitted). Instead, "our function is 'to engage in a careful and principled consideration of the agency record and findings.'" Ibid. (quoting Williams v. Dep't of Corr., 330 N.J. Super. 197, 204 (App. Div. 2000)). A hearing officer's findings must be "sufficiently specific under the circumstances of the particular case to enable the reviewing court to intelligently review an administrative decision and ascertain if the facts upon which the order is based afford a reasonable basis for such an order." Lister v. J.B. Eurell Co., 234 N.J. Super. 64, 73 (App. Div. 1989) (quoting In N.J. Bell Tel. Co. v. Commc'ns Workers of Am., 5 N.J. 354, 377 (1950)). It also is well settled that an agency's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

Pursuant to N.J.A.C. 10A:4-4.1(a):

> An inmate who commits one or more . . . numbered prohibited acts shall be subject to disciplinary action

and a sanction that is imposed by a Disciplinary Hearing Officer . . . . Prohibited acts preceded by an asterisk (*) are considered the most serious and result in the most severe sanctions . . . . Prohibited acts are further subclassified into six categories of severity (Category A through F) with Category A being the most severe and Category E the least severe and Category F containing an opportunity for inmates found guilty of specified infractions to participate in a substance-use disorder treatment program . . ., if eligible . . . .[3]

To find an inmate guilty of a prohibited act under N.J.A.C. 10A:4-4.1, a hearing officer must have substantial evidence of the inmate's guilt. N.J.A.C. 10A:4-9.15(a). "'Substantial evidence' means 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Figueroa,

---

[3] Under the version of N.J.A.C. 10A:4-4.1(a) in effect at the time of the April 9 incident, Category F did not exist, and a finding of guilt for a Category A offense, such as prohibited act *.252, carried with it "a sanction of no less than 181 days and no more than 365 days of administrative segregation per incident." N.J.A.C. 10A:4-4.1(a) (2017). The range of sanctions under N.J.A.C. 10AA:4-4.1(a) was amended in 2021 so that now,

> [a] finding of guilt for any offense in Category A may result in a sanction of five to [fifteen] days in an Adjustment Unit and up to 365 days in a Restorative Housing Unit (R.H.U.) per incident and one or more of the sanctions listed at N.J.A.C. 10A:4-5.1(e), unless a medical or mental health professional determines that the inmate is not appropriate for R.H.U. placement. Where a medical or mental health professional has made such a determination, the inmate may receive one or more of the less restrictive sanctions listed at N.J.A.C. 10A:4-5.1(e).

9

414 N.J. Super. at 192 (quoting In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961)).

Guided by these principles, we conclude the DOC's decision is not accompanied by the necessary findings of fact to establish that Rosa encouraged a riot. Accordingly, we remand the matter to the DOC to address this deficiency.

Here, after making certain factual findings, the hearing officer concluded that "[w]hile it is not known what each inmate's specific role was in the disturbance,"

> [o]ver [fifty percent] of inmates on the unit . . . claim[ed] they were on their bunks[;] credibility is voided as video . . . clearly shows majority of inmates congregating in the dayroom, disobeying orders and rules given. . . . Inmates were all housed together after the incident . . . [and] were able to collaborate stories and provide witness statements for each other . . . to support each other . . . and . . . gain peer approval.

But instead of discrediting Rosa's statement about the incident in particular, the hearing officer acknowledged his defense and found his "standing out on the wing . . . is not being on your bunk for count, which is adding to the overall chaos and rioting behavior." She qualified her findings by adding, "[a]ny behavior that is not compliant with staff orders can be viewed as encouraging and inciting non-compliant behaviors." (Emphasis added).

10                                                    A-4010-19

Because we are not confident that "any behavior that is not compliant with staff orders can be viewed as encouraging and inciting non-compliant behaviors," let alone "encouraging a riot," the actual charge against Rosa, we remand this matter to allow the hearing officer to more fully address the proof supporting Rosa's commission of the alleged infraction. Alternatively, on remand the hearing officer may consider whether there is a basis to charge Rosa with some other prohibited act (in which case Rosa would be entitled to notice and a hearing to address the newly-charged infraction, N.J.A.C. 10A:4-9.16), or whether proof of Rosa's guilt regarding any infraction is lacking. In that respect, we note that when Lieutenant Ernest answered a series of confrontation questions in this matter, he stated the following:

> Encouraging a riot exists whenever a group of inmates assaults any official, destroys state property, bands together to resist authority, refuses to return to their housing assignments, or causes an overt act which interferes with the orderly running of the institution or endangers the well[]being of any staff member or inmate. Additionally, the incident is uncontrollable by the staff on duty at the time the situation develops. A group demonstration exists whenever a group of inmates passively protest a cause of concern, none of the above criteria are met, and the incident is able to be controlled by staff on duty at the time the situation develops. Interfering with count exists when [one] or more inmates refuse to go to their assigned bed/cell/etc. to be counted when ordered to do so. Refusing to obey an order exists when an inmate purposely, knowingly,

11

actively, physically, refuses to comply with a lawful order.

We do not ignore the distinctions set forth in Lieutenant Ernest's statement regarding the variety of acts that an inmate might commit which could be considered "non-compliant," yet fail to constitute the Category A infraction of "encouraging a riot." Indeed, as Lieutenant Ernest suggests, such acts might include less serious offenses, such as those delineated in Category B of N.J.A.C. 10A:4-4.1, including prohibited acts: *.256 (refusing to obey an order of any staff member); *.306 (conduct which disrupts or interferes with the security or orderly running of a correctional facility); and *.502 (interfering with the taking of count). N.J.A.C. 10A:4-4.1(a)(2).[4] Accordingly, on remand, we trust the hearing officer will carefully sift through the proofs presented and elicit any additional information deemed necessary to determine whether there is substantial evidence to conclude Rosa committed any disciplinary infraction. We express no opinion regarding the outcome of such proceedings.

Vacated and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

_____

[4] Per N.J.A.C. 10A:4-4.1(a)(2), "[a] finding of guilt for any offense in Category B may result in a sanction of up to 120 days" in administrative segregation per incident, as well as other sanctions set forth at N.J.A.C. 10A:4-5.1(g).

A-4010-19