**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1231-23

GENWORTH LIFE INSURANCE
COMPANY,

     Petitioner-Appellant,

v.

JUSTIN ZIMMERMAN,
COMMISSIONER, NEW
JERSEY DEPARTMENT OF
BANKING AND INSURANCE,

     Respondent-Respondent.

_____

Argued May 7, 2025 – Decided June 6, 2025

Before Judges Mayer, Rose and DeAlmeida.

On appeal from the New Jersey Department of Banking and Insurance.

Eamon P. Joyce (Sidley Austin LLP) of the New York bar, admitted pro hac vice, argued the cause for appellant (Bressler, Amery & Ross, PC, Blank Rome LLP, and Eamon P. Joyce, attorneys; Cynthia J. Borrelli, Eamon P. Joyce, and Stephen M. Orlofsky, on the briefs).

G. Glennon Troublefield argued the cause for respondent (Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC, attorneys; G. Glennon Troublefield, Brian H. Fenlon and Robert Vasquez, of counsel and on the brief).

PER CURIAM

Plaintiff Genworth Life Insurance Company (Genworth) appeals from a November 9, 2023 final agency decision by defendant New Jersey Department of Banking and Insurance (Department) denying a rate increase for its long term care (LTC) insurance policies. We affirm.

Genworth is a national LTC insurance company. In 2004 or 2005, Genworth began selling LTC insurance policies in New Jersey. Genworth stopped issuing new LTC insurance policies in 2012.

Prior to January 18, 2006,[1] Genworth's LTC policies were known as "loss-ratio" or "pre-rate stability" policies. Policies issued by Genworth after January 18, 2006, were known as "rate stability" policies.

As of December 31, 2019, Genworth issued approximately 13,300 "guaranteed renewable" LTC policies in New Jersey. These policies could not

---

[1] January 18, 2006 is the effective date of changes to regulations governing LTC insurance policies in New Jersey. The regulation changes did not affect the substance of Genworth's LTC policies.

be canceled or modified provided the policyholders continued to pay the insurance premiums.

Because guaranteed renewable LTC insurance policies anticipated potential claims arising decades later, Genworth priced its policies based on actuarial assumptions to project the premiums it expected to earn, and the claims it anticipated incurring, over the lifetime of the policy. This projection is known as the lifetime "loss ratio." Genworth included an industry-standard ten percent margin for adverse experience (MAE), representing an additional premium to serve as a pricing cushion and avoid later requests for rate increases.

Genworth's initial average annual rate for pre-rate stability policies was $2,024. Its initial average annual rate for rate stability policies was $2,077. Genworth priced its LTC insurance policies to achieve a lifetime loss ratio of 64.3%.

Almost a decade after offering LTC insurance in New Jersey, Genworth realized it severely underpriced its policies.[2] Genworth miscalculated the number of policyholders who would cancel their coverage or allow it to lapse,

---

[2] As did other national insurance companies issuing LTC insurance policies. In fact, the unanticipated rate crisis resulted in the collapse of the LTC insurance industry. By 2023, approximately twelve insurance companies continued to offer LTC insurance policies nationwide as compared to approximately one hundred such carriers in 2000.

the number of policies terminated due to death of the policyholder, the number of claims filed by policyholders, and price increases attributable to interest rates and inflation.

As a result of its inaccurate pricing predictions, Genworth adopted a nationwide multi-year rate action plan to achieve rate increases to support the payment of claims. Genworth's goal was to achieve a 150% nationwide rate increase for its LTC insurance policies.

New Jersey enacted legislation and the Department adopted rules governing the issuance of LTC insurance policies. Premiums for LTC insurance policies in this state are governed by the Long Term Care Insurance Act, N.J.S.A. 17B:27E-1 to -13 (Act), which was adopted in 2004 and based on language in a model act adopted by the National Association of Insurance Commissioners (NAIC). The Assembly and Senate Committee Statements accompanying the Act augmented the NAIC's model act by requiring rates "not be excessive, inadequate, or unfairly discriminatory." N.J.S.A. 17B:27E-11 expressly provides:

> An insurer providing long-term care insurance issued on an individual basis in this State shall file, for the commissioner's approval, its rates, rating schedule and supporting documentation demonstrating that it is in compliance with the applicable loss ratio standards of this State. All filing of rates and rating schedules shall

4

demonstrate the benefits are reasonable in relation to the premium charged and that the rates are not excessive, inadequate or unfairly discriminatory.

Neither the Act nor the Department's rules define the term "excessive." However, as the foregoing statutory provision made clear, insurers issuing LTC policies in New Jersey are required to "demonstrate the benefits are reasonable in relation to the premium charged" to policyholders and the amount charged is "not excessive, inadequate or unfairly discriminatory."

Under the Department's rules, insurers of guaranteed renewable LTC insurance policies are allowed to request rate increases to realign premiums with expected claims. N.J.A.C. 11:4-34.4(a)(2). Under N.J.A.C. 11:4-34.18.5 and N.J.A.C. 11:4-34.17, applicable to Genworth's pre-rate stability LTC insurance policies, rate increases "are presumed reasonable" if the anticipated and aggregate loss ratio "is at least 55 percent." According to N.J.A.C. 11:4-34.18, applicable to Genworth's rate stability LTC insurance policies, premium rate increases "shall be determined" pursuant to a dual loss ratio standard where the present value of actual past and projected future incurred claims, including a margin for MAE, shall be at least equal to fifty-eight percent of the base level of the premium and eighty-five percent of the premium attributable to any rate increases.

A-1231-23

The Department's approval of an insurer's requested rate increase considers the NAIC's "Guidance Manual for Rating Aspects of the [LTC] Insurance Model Regulation." A proposed rate increase application must include a certification from a qualified actuary, stating the filing complies with applicable Department rules, and an actuarial memorandum setting forth actuarial assumptions and other information supporting the requested increase. N.J.A.C. 11:4-34.18(b).

In preparing the assumptions, actuaries adhere to Actuarial Standards of Practice (ASOP) developed by the Actuarial Standards Board of the American Academy of Actuaries. ASOP 8 states rates are excessive "if they exceed the rate needed to provide for payment of claims, administrative expenses, taxes, regulatory fees, and reasonable contingency and profit margins."

In November 2016, Genworth requested a 76.8% rate increase, including a ten percent MAE, on its rate stability LTC insurance policies. Genworth asserted its expected lifetime loss ratio without a rate increase was 81.5%, but with the increase, it would be 64.8%. Genworth's actuary certified the company's submission conformed to ASOP 8, and stated "the requested rates [were] not excessive, inadequate, or unfairly discriminatory."

The Department denied Genworth's 2016 requested rate increase and instead approved a rate increase of 33.1% phased in over three years. Genworth agreed to the Department's approved rate increase. In denying Genworth's requested rate increase, the Department explained: "If your experience continues to unfold as projected and you re-file for additional rate adjustments, the total future increases the Department expects to approve will eventually allow you to achieve the lifetime loss ratio of 64.3% (assuming future filings are in compliance with N.J.A.C. 11:4-34.18)."

In 2017, Genworth requested a 66.8% rate increase for its pre-rate stability LTC insurance policies. Genworth asserted its expected lifetime loss ratio without a rate increase was 81.2%. Genworth's actuary again certified the company's submission complied with all actuarial standards and the requested rate increase was not excessive.

The Department denied Genworth's 2017 rate increase request. Instead, the Department approved a rate increase of 8.68% phased in over two years. Genworth accepted the Department's offered increase. In denying the rate increase requested by Genworth, the Department stated: "Although the above cumulative rate increases are lower than the annual rate increases requested in

7

the filing, the Department expects to work with the Company in the future towards a path of attaining the pricing lifetime loss ratio of 75%."

After receiving rate increases in 2016 and 2017, Genworth submitted two applications to the Department in November 2020 again requesting rate increases on its LTC insurance policies. Specifically, Genworth requested a rate increase of: (1) 142% on its rate stability LTC insurance policies; and (2) 165% on its pre-rate stability LTC insurance policies.

The 2020 requested increases included the balances of the 2016 and 2017 requested rate increases denied by the Department. Additionally, the 2020 applications sought increases based upon modifications to the actuarial assumptions from Genworth's 2016 and 2017 submissions to the Department. Genworth also increased its MAE from ten to fifteen percent. Genworth confirmed it sought to return to the original pricing lifetime loss ratio of 64.3%. It also acknowledged an intent to use profits from the requested rate increases to pay claims on other Genworth business lines.

When it submitted the 2020 applications, Genworth had 1,755 pre-rate stability policies and 11,635 rate stability policies in effect. The average annual premium in 2020 for these policies was $2,200 and $2,765, respectively. With Genworth's requested rate increases, the average yearly cost to policyholders for

these policies would more than double to $5,831 and $6,691, respectively. Considering the Department's approved rate increases in 2016 and 2017, Genworth's 2020 requested rate increases on LTC rate stability policies represented an increase of 175% from Genworth's original pricing. The 2020 requested rate increases on Genworth's LTC pre-rate stability policies resulted in an increase of 174% over the original pricing.

Genworth explained that insureds age seventy-five and older were a "key driver" behind the requested rate increases because that demographic group had higher than expected incident rates. Genworth also identified categories of revised actuarial assumptions based upon updated data from 2014 through 2019.

Genworth's applications for increased rates for New Jersey LTC policies revealed Genworth: (1) accumulated $73,612,593 in earned and written premiums; (2) incurred $15,390,328 in claims; and (3) paid out only $7,556,001 in claims. Based on these figures, Genworth's historical loss ratio was 41.8% (far lower than 64.3%) when it filed its 2020 rate increase applications.

Between November 2020 and December 2021, the Department reviewed Genworth's rate increase applications. On January 8, 2021, the Department issued the first of a series of disapproval/objection letters, listing deficiencies in

A-1231-23

the applications and requesting additional information and clarification. Genworth responded to the Department's letters.

In letters dated December 22 and 27, 2021, the Department determined Genworth's filings did not satisfy the requirements for a rate increase, explaining:

> Your assumption regarding the acceptable maximum lifetime loss ratio of 64.3% represents an aggressive loss ratio target. Genworth's positions to both bring the lifetime loss ratio close to the original pricing target and to use profits from this block to pay claims for other Genworth business do not represent an intent for Genworth to share the burden of the unfavorable performance for these policies with the policyholder. . . . The Department expects carriers to share materially in the unfavorable performance.

On January 6, 2022, Genworth requested the Department transfer the matter to the Office of Administrative Law for a hearing. On March 23, 2022, the Department granted the request.

An administrative law judge (ALJ) conducted hearings over the course of four days in January and February 2023. Genworth proffered testimony from the following actuaries: Nick Sheahon, Alex Vichinsky, and Allen J. Schmitz. The Department presented testimony from its chief actuary, Seong-Min Eom, and another actuary, Lawrence Segal. Schmitz and Segal testified as expert witnesses.

A-1231-23

Sheahon testified insurers typically pool premiums received and use the funds to cover claims submitted for other company issued insurance policies. In submitting the rate increase applications, he explained Genworth considered its nationwide experience with LTC insurance policies, rather than its state-by-state experience. According to Sheahon, the industry standard MAE was ten to fifteen percent, and the "first trigger" for seeking a rate increase was exceeding the MAE.

Sheahon stated that Genworth's 2020 rate increase requests were larger because the Department did not grant the full requested increases in 2016 and 2017. He further noted, with the passage of time, there were fewer policyholders to pay premiums. However, he conceded a reduction in the number of policyholders would also reduce the number of future claims. Sheahon confirmed regulatory authorities commonly approved lower rate increases than requested by insurers.

Schmitz, Genworth's expert witness, agreed there was nothing unusual about an insurance company pooling premiums and using profits from one block of business to pay claims on other business. He explained insurance companies required a capital reserve to maintain their overall ability to pay claims.

Schmitz confirmed Genworth's proposed 142% and 165% rate increases were the maximum increases allowed under the Department's rules. Schmitz testified the proposed rate increases were not excessive under N.J.S.A. 17B:27E-11 because they met the regulatory requirements and were actuarially justified. However, Schmitz acknowledged other factors could drive an agency's rate-setting decision apart from an insurance company's compliance with regulations.

Schmitz further testified Genworth's updated assumptions were reasonable and credible. He explained Genworth took a blended approach to its assumptions, i.e., combining baseline assumptions with experience to arrive at a credibility factor. In formulating assumptions, Schmitz stated actuaries were required to make judgment calls, and it could take months or years to accumulate sufficient data to determine whether the assumptions were correct.

In the event of statutory or regulatory ambiguity, Schmitz explained actuaries preparing rate increase applications looked to the ASOPs for guidance. He acknowledged ASOP 8 defined "excessive" and, applying that definition, maintained Genworth's proposed rates were not excessive.

Schmitz noted the Department's characterization of Genworth's goal of achieving a lifetime loss ratio of 64.3% as "aggressive" conflicted with the Department's apparent approval of that goal in 2016. However, Schmitz

12

acknowledged Genworth was not entitled to expect a 64.3% lifetime loss ratio. He further explained that Genworth's focus on achieving a 64.3% lifetime loss ratio could be perceived as an attempt to recoup its past losses. Schmitz confirmed regulatory authorities commonly limited proposed rate increases where the increases reflected an effort to recoup past losses.

The Department's chief actuary, Eom, testified the Department did not automatically approve rate increase applications simply because they were in accordance with the Department's rules. According to Eom, the Department also considered whether the requested rate increases were unreasonable and excessive. Eom explained the rules merely established the minimum filing requirements necessary for the Department to begin its review. She further stated the Department considered an insurance company's past filings, industry trends, and impact on the consumer. Eom noted the Department approved lower rate increases than requested about ninety-nine percent of the time.

Eom testified LTC insurance policy premiums were expensive, non-refundable, and paid by policyholders for decades before policyholders realized any benefit. While the Department had an interest in promoting the solvency of the insurer, Eom explained the Department also had an obligation to ensure that aging policyholders, likely on fixed incomes, were not forced to let their policies

A-1231-23

lapse and forgo their expected benefits due to unreasonable and excessive premiums. According to Eom, the older the individual, the more expensive the premium for a new LTC insurance policy.

Eom testified Genworth's actuarial memoranda met the regulatory formula for both 2020 applications. However, she explained Genworth's applications were denied because: (1) the requested rate increases were the maximum allowable under the rules; (2) policyholder premiums would more than double; (3) Genworth anticipated some of its profits from the rate increases would cover claims in other areas of its business; (4) both the fifteen percent MAE and the lifetime loss ratio target of 64.3% were "aggressive"; (5) by requesting such increases, Genworth was not shouldering its share of the burden of incorrect initial pricing and unfavorable performance of its products; and (6) the Department expressed concerns about the data upon which the rate increases were premised. She acknowledged the Department's denial letters did not mention all of these reasons.

Eom also testified Genworth was not guaranteed to receive a 64.3% lifetime loss ratio, and the Department had no obligation to facilitate Genworth's achievement of that ratio. She explained a MAE was a discretionary buffer, usually set at ten percent, and the Department saw no justification for

Genworth's fifteen percent MAE other than generating more money for the company. She explained that if Genworth's rate increase requests not been so large, the Department would not have objected to Genworth using some of its profits to cover other business lines.

Eom also expressed a lack of confidence in some of the data relied upon by Genworth in formulating its assumptions for the 2020 rate increases. She testified inconsistencies in summaries of historical premiums and claims reflected a "data control problem." The Department concluded different events, such as COVID, were likely to change mortality, morbidity, and policyholder behavior. As such, the Department sought additional data, based on actual experience, to support Genworth's updated assumptions.

Segal, the Department's expert, also testified. He acknowledged the actuarial assumptions and methods employed by Genworth in formulating its requested rate increases were not disputed. However, he testified proposed rate increases were not automatically approved simply because they followed the required actuarial analysis, and were often rejected or reduced by regulatory agencies acting within their discretion based upon non-actuarial considerations. Segal explained there could be a wide range of regulatory decisions on essentially the same filing across different states.

Where proposed rates were more than double existing rates, as Genworth requested, Segal opined the regulatory agency was entitled to consider the application from a consumer's standpoint and deem the rate increase excessive. According to Segal, the Department considered whether a consumer might not be able to obtain LTC coverage elsewhere in determining if the requested rate increase was excessive.

Segal agreed with the Department that Genworth premised its applications on achieving a lifetime loss ratio in accordance with its original pricing target and using profits from the increased premiums to subsidize other business. Segal explained Genworth's goals did not align with the general rule that insurance carriers share materially in the unfavorable performance of their policies, and would force New Jersey policyholders to "absorb[] the financial consequences of . . . [Genworth's] mispriced products." Segal also deemed Genworth's increased MAE "debatable." According to Segal, by increasing its MAE, thereby inflating policy premiums, Genworth incentivized healthier policyholders to terminate their LTC policies, leaving a smaller pool of policyholders to bear the brunt of larger rate increases in the future.

On June 26, 2023, the ALJ issued an initial decision explaining that: (1) for the rate stability policies, Genworth developed the increased rates according

16

to the dual loss ratio formula set forth in N.J.A.C. 11:4-34.18(c); and (2) for the pre-rate stability policies, Genworth set the increased rates to result in a lifetime loss ratio that complied with the fifty-five percent loss ratio standard under N.J.A.C. 11:4-18.5 and N.J.A.C. 11:4-34.17. Consistent with all of the expert testimony, the ALJ found the Department properly used its discretion in assessing the excessiveness of Genworth's proposed rates based on non-actuarial considerations. The ALJ explained the "crux of the issue [was] whether the Department maintains the discretion to disapprove the requested rate increases under the [Act] despite loss ratio or rate stability regulatory compliance for such increases, a legal issue."

Based on the testimony, the ALJ found:

> Here, Genworth maintains that the Commissioner must approve its requested rate increases, which satisfy the formulas outlined in the rate-increase regulations. Genworth asserts that the Department's review of its filings is limited only to actuarial considerations as expressed in the regulations it enacted. Genworth argues that . . . because the Department's disapproval was beyond the regulations and actuarial considerations . . . its denial [constituted improper rule-making or improper creation of a new statutory criterion].
>
> . . . .
>
> Here, the Department considered all information submitted by Genworth, as well as the impact on the policyholders who have been paying premiums for

decades, including increased premiums from past rate increases, and determined that the requested rate increases were excessive and unreasonable. The Department considered "excessive" in an ordinary and common-sense meaning. DiProspero v. Penn, 183 N.J. 477, 492 (2005) . . . (courts will "ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions . . . to give sense to the legislation as a whole"); Merriam-Webster Dictionary(defining "excessive" as "exceeding what is usual, proper, necessary, or normal"). Significantly, the regulations and Act do not define what constitutes excessive, giving the Department the flexibility to assess rate requests and other requirements under the Act. See Cammarata v. Essex Cnty. Park Comm'n, 26 N.J. 404, 410 (1958) (noting that regulation promulgation provides "flexible control in areas where the diversity of circumstances and situations [it may encounter] forbids the enactment of legislation anticipating every possible problem which may arise and providing for its solution.")

Specifically, while Genworth's revised assumptions were credible, the Department felt Genworth should share the negative experience with insureds, even though this left fewer premium funds available to Genworth to pay expenses, taxes, and profits. Genworth anticipated using increased premiums across other business lines. Whether typical or not in the industry, the Department felt that this intention meant that an excess of premiums would go to Genworth on the policyholders' backs if it granted the significant increases. Indeed, much of the "judgmental" assessments employed by the Department looked to the [Genworth] policyholder. Genworth projected future claims experience and policyholder behavior, but the data to support those projections was not fully known. If unable to withstand a dramatic

18

increase like here, a policyholder is forced to choose lesser benefits than anticipated when purchasing the policy. Further, the Department considered the lifetime loss ratio deterioration before a rate increase, nationally and in New Jersey, to be insufficient to justify a rate increase. Genworth's recent experience showed only about a 15% loss ratio when filing based on the few claims it paid against the premiums it received from New Jersey policyholders. In other words, I CONCLUDE that the Department's disapproval of Genworth's rate increases for excessiveness is not unreasonable. See Barone v. Dep't of Human Servs., 210 N.J. Super. 276, 285 (App. Div. 1986) . . . (explaining that a presumption of reasonableness attaches to an administrative agency's actions, and any challenger must show that the action was arbitrary, unreasonable, or capricious).

The ALJ also explained:

In denying Genworth's requested rate increases, the Department did not prescribe a legal standard not otherwise provided for or inferable from the enabling Act. Indeed, the Act requires Genworth to demonstrate that its rates are not "excessive" in addition to meeting loss ratio standards and showing that the premiums are reasonable in relation to the benefits received. Undeniably, the Department is expressly empowered to "promote the public interest" and to protect the insureds. . . . [T]he Department's action here was purely adjudicative [rather than a statement of policy]. Further, the Department's determination was consistent with the past positions of negotiating with insurance providers to arrive at rate increases that balance the insurers' interests against policyholders' interests.

19

On November 9, 2023, Trish Wallace, the Department's Acting Commissioner, issued a final decision and order adopting the ALJ's initial decision disapproving Genworth's requested rate increases on its LTC policies. The Acting Commissioner found the ALJ's findings were amply supported by the record.

Because the Legislature intended for the Act to promote the public interest and protect policyholders, the Acting Commissioner further found an insurer's requested rate increase was not automatically approved even if the application satisfied the rule requirements. Citing N.J.S.A. 17B:27E-11, the Acting Commissioner stated the Act required the Department to assess whether proposed rates were excessive and consider non-actuarial factors to protect policyholders. The Acting Commissioner found the regulations were the minimum threshold to be met by an insurer seeking a rate increase.

The Acting Commissioner concluded Genworth's requested rate increases were excessive under both the common sense meaning of the term and the meaning ascribed to that term within the actuarial industry. In support of this finding, the Acting Commissioner noted: (1) Genworth requested the maximum increase, including an aggressive fifteen percent MAE; (2) in so doing, Genworth hoped to maximize its premiums and secure excess profits to pay for

20

its other insurance lines; (3) data indicated Genworth paid far less in claims compared to the amount it received from the premiums paid by policyholders; (4) at the time of the 2020 applications, Genworth had a loss ratio of only 41.8% for its pre-rate stability policies, and 52.5% for its rate stability policies; (5) some of Genworth's policyholders paid premiums for their LTC policies over the course of decades, and were now older and on a fixed income; (6) rate increases would significantly impact these older policyholders; and (7) these policyholders were entitled to receive the expected benefits when they purchased their policies, rather than being forced to accept reduced benefits to avoid a significant rate increase.

While the Department acknowledged Genworth's data underlying its filings, the Acting Commissioner noted Eom's lack of confidence in the quality of the data based on the significant degree to which the company's actuarial assumptions changed over the years. The Acting Commissioner found this further undercut the propriety of Genworth's rate increase requests.

The Acting Commissioner also rejected Genworth's claim that the Department's denial of its 2020 filings was not premised on the increases being excessive because the Department never used the term "excessive" in its denial letters. She explained:

> Regardless of whether the Department used the term "excessive" in its letter not approving the requested rate increases, the evidence in the record supports the finding that the requested rates are excessive pursuant to N.J.S.A. 17B:27E-11. Genworth's argument relies on the fact that the Department did not use the word "excessive" in its communications with Genworth about why it did not approve the requested rate increases. However, this argument ignores the Department's communications with Genworth that the targeted lifetime loss ratio was "aggressive." . . . There is no requirement that the Department use the word "excessive" when not approving rate increases on that basis.

Additionally, the Acting Commissioner agreed with the ALJ that the Department did not engage in impermissible rulemaking in rejecting Genworth's requested rates as excessive simply because that term is undefined in the Act or the Department's rules. The Acting Commissioner found the Department merely applied a standard articulated in the Act to a specific filing and the data, experience, and assumptions supporting that filing. The Department did not prescribe a legal standard not authorized under the Act. Rather, as the Acting Commissioner found, the Department construed a term within the enabling statute based on its common sense meaning and definition of the term within the actuarial industry.

On appeal, Genworth argues the Department's disapproval of its applications for a rate increase was arbitrary and capricious, as well as contrary

to law. Genworth asserts the Department's disapproval was not based on "excessiveness" and cannot be upheld on that basis post hoc. Additionally, Genworth argues the Department was required to adopt regulations implementing the Act's "excessiveness" provision. We reject these arguments.

Judicial review of an agency's determination is limited. Allstars v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). We must "be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). We will not overturn an administrative agency decision unless it was arbitrary, capricious or unreasonable, violated legislative polices expressed or implied in the enabling legislation, or unsupported by substantial, credible evidence. Melnyk v. Bd. of Educ. of Delsea Reg'l High Sch. Dist., 241 N.J. 31, 40 (2020).

Our review of the agency's record must encompass "the proofs as a whole" and must consider "the opportunity of the one who heard the witnesses to judge their credibility, and, in the case of agency review, . . . the agency's expertise where such expertise is a pertinent factor." Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). However, we are "in no way bound by [an] agency's

interpretation of a statute or its determination of a strictly legal issue." Melnyk, 241 N.J. at 40 (quoting Ardan v. Bd. of Rev., 231 N.J. 589, 604 (2018)).

Because the Department's disapproval letters never explicitly stated the requested rate increases were excessive, Genworth argues the decisions by the ALJ and the Acting Commissioner were arbitrary and capricious. Contrary to Genworth's contention, the ALJ and the Acting Commissioner did not rewrite the rationale for the Department's disapproval of the requested rate increase. When Genworth submitted its actuarial memoranda and certified the request for significant rate increases was not excessive under established actuarial standards, Genworth knew such an opinion would be tested by the Department. This is particularly true given the size of Genworth's requested rate increase. Further, in 2016 and 2017, Genworth submitted requests for rate increases to the Department, and the Department countered with a much lower rate increase.

Additionally, in its responses to the Department's disapproval of the requested rate increases, Genworth acknowledged it relied on aggressive calculations in preparing its requests. Genworth explained it did so to maximize profits and use the profits to bolster other Genworth business lines. Genworth admitted its rate increase requests relied on future actuarial assumptions,

including an enhanced MAE of fifteen percent rather than the customary ten percent, and entitlement to a lifetime loss ratio of 64.3%.

Significantly, the Department noted future data might not support Genworth's updated assumptions. Genworth did not dispute that contention. Nor did Genworth offer any justification for a fifteen percent MAE. Additionally, Genworth's claim of diminished returns on LTC policies was belied by the limited number of claims Genworth actually paid to its policyholders.

Nor was the Department arbitrary or capricious in rejecting Genworth's claim of entitlement to a 64.3% lifetime loss ratio. Genworth's own expert, Schmitz, testified Genworth was not entitled to expect such a percentage. According to Schmitz, by focusing on a 64.3% lifetime loss ratio, Genworth could be viewed as improperly attempting to recover for past losses by imposing an undue financial burden on its aging policyholders. Further, Schmitz explained regulatory agencies frequently limited proposed rate increases that reflected recoupment of an insurance carrier's past losses.

Moreover, as the Acting Commissioner explained, the Department was not obligated to use the word "excessive" when denying a rate increase. Genworth's reliance on <u>New Jersey Bell Telephone Co. v. Communications</u>

Workers of America, New Jersey Traffic Division No. 55, 5 N.J. 354 (1960), is misplaced. In that case, the agency's findings lacked sufficient factual data for the reviewing court to determine whether the agency's conclusion was supported by the record. Id. at 374-79. Here, the record contains ample information supporting the Department's finding Genworth's triple-digit rate increase, affecting its aging and retiring LTC policyholders, was excessive.

We also reject Genworth's claim the disapproval of its requested rate increases as "excessive" must be rejected because the Department was required to adopt regulations defining and implementing the Act's "excessiveness" provision.

The Department did not need to adopt a regulation defining the term "excessive" as used in N.J.S.A. 17B:27E-11. Words in a statute are usually read in accordance with their ordinary meaning. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009). Technical terms or terms of art are construed in accordance with the meanings ascribed to them by experts in the relevant field. In re Lead Paint Litig., 191 N.J. 405, 430 (2007).

We are satisfied the word "excessive" is not a term of art. Because the ordinary meaning of the term "excessive" is ascertainable from a dictionary, there was no need for the Department to adopt a separate explanatory rule.

Further, the definition of "excessive rates" is set forth in ASOP 8, providing rates are excessive if they exceed the rate needed to pay claims, administrative expenses, taxes, regulatory fees, reasonable contingencies, and profit margins. Genworth's expert testified actuaries use the ASOPs for guidance when preparing rate increase applications. Thus, there was no need for the Department to define the term "excessive," particularly because the work associated with rate increase applications is performed by actuaries who are undoubtedly familiar with the ASOPs. Additionally, the Legislature could have defined the term "excessive" if it believed a definition was necessary when it adopted the Act.

We also reject Genworth's argument the Department engaged in improper rulemaking. We agree with the Acting Commissioner's determination that the Department's disapproval of Genworth's requested rate increases constituted administrative adjudication and not rulemaking.

Here, the Department's decision: (1) did not have widespread, continuing, and prospective effect; (2) embodied a concept expressly authorized by the Act; (3) was adjudicated after Genworth had ample opportunity to defend its position that the rate increase applications were not excessive as stated in its actuary's certifications; (4) did not exceed concerns specific to Genworth; and (5) did not

27

constitute a change from a clear, past agency position of approving rate increases at an amount lower than requested. See Metromedia, Inc. v. Director, Div. of Tax'n, 97 N.J. 313, 331-32 (1984) (discussing the circumstances where an agency action must be considered rulemaking).

We are satisfied the Department's decision is supported by sufficient credible evidence on the record as a whole and is not arbitrary or capricious. See R. 2:11-3(e)(1)(D). To the extent we have not addressed any of Genworth's arguments, they are without sufficient merit to warrant further comment. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

28